**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X Case No.: 23-cv-05716
HELDER RAMIREZ,

                              Plaintiff,

                                                            **COMPLAINT**

                    -against-


IDD CARS, LLC d/b/a Volkswagen of Nanuet and
AMERICAN HERITAGE FEDERAL CREDIT UNION,

                              Defendants.
------------------------------------------------------------------------X

          Plaintiff, by and through his attorneys, FAGENSON & PUGLISI,

PLLC, upon knowledge as to himself and his own acts, and as to all other matters

upon information and belief, brings this complaint against above-named defendants

and in support thereof alleges the following:

                              <u>INTRODUCTION</u>

          1.     This action concerns a car dealership, defendant IDD CARS, LLC

d/b/a Volkswagen of Nanuet (or the "Dealership") which, on October 7, 2021, sold a

used 2014 Honda Civic automobile ("Vehicle") to plaintiff, despite knowing that it did

not have the existing certificate of title to the Vehicle. When, twenty-six days after the

Dealership sold the Vehicle to plaintiff, the temporary tag which the Dealership gave to

plaintiff expired, plaintiff was unable lawfully to operate the Vehicle on the public

roadway, rendering the Vehicle completely useless to him. But, instead of belatedly

obtaining the title and forwarding the title and registration application to the Pennsylvania

1

Department of Transportation ("DOT") so that a new title could be issued for the Vehicle and so that plaintiff could obtain his permanent registration and license and be able lawfully to operate the Vehicle once more, the Dealership advised that plaintiff continue to operate the Vehicle without registration or license, and that if the police pulled plaintiff over and gave plaintiff a traffic ticket, the Dealership would pay for it.

2.      Plaintiff declined the Dealership's invitation to break the law and willfully subject himself to the penal action of law enforcement. Up to near end of February 2022, the Dealership had still not provided the title and registration application to the DOT. Up to near end of February 2022, plaintiff was still unable lawfully to operate the Vehicle. The lack of personal transportation disrupted plaintiff's life, especially occurring as it did in the throes of the COVID-19 pandemic.

3.      For its part, when plaintiff complained to defendant American Heritage Federal Credit Union (or "AHFCU")–which had given him a loan to purchase the Vehicle–AHFCU told plaintiff there was nothing it could do to help him in that it would neither release him from the loan obligation nor could it procure the Dealership to provide the title and registration application to the DOT so that he could obtain the registration and license and be able to operate the Vehicle. Indeed, AHFCU fully expected and demanded that plaintiff continue to repay the loan for a Vehicle which AHFCU knew plaintiff could not operate. When plaintiff rightfully refused to continue repayment of the loan, AHFCU destroyed his credit rating, rendering him unable to obtain credit for a home or for, in fact, anything else.

4.     Both defendants refused to honor plaintiff's right to rescind the sale and loan contracts although plaintiff had good cause to do so, not only because the Vehicle was useless to him through no fault of his own, but also because of other violations which each defendant perpetrated against him.

5.     As alleged more fully herein, defendants' misconduct has caused plaintiff's life to devolve into misery and continues to do so. Defendants' abusive conduct was not aimed at plaintiff only but also at members of the public at large. As example, at all times material hereto, the Dealership defrauded plaintiff in the same manner in which it defrauded so many of its customers in selling vehicles to which it did not have good title at the time of sale and delivery. Similarly, certain of AHFCU's violations of law were committed on form documents which it used not only in its transaction with plaintiff, but which, at all times material hereto, it used in its transactions with other members of the public.

6.     Plaintiff brings this action seeking damages against the Dealership pursuant to the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq*., as well as pursuant to the New York Uniform Commercial Code ("NYUCC") §§ 2-312 and 2-314; damages against the Dealership pursuant to New York General Business Law ("NYGBL") § 349 for the Dealership's deceptive acts and practices; damages against the Dealership for common-law fraud, for conversion and for unjust enrichment; damages against AHFCU for deceptive acts and practices under Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, *et seq*; and for declaratory relief against AHFCU.

## JURISDICTION AND VENUE

7.      Plaintiff re-alleges paragraphs 1-6 as if fully re-stated herein.

8.      This Court has federal jurisdiction pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*. and 28 U.S.C. § 1331. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same set of transactions forming the basis of the federal claims.

9.      With regard to 15 U.S.C. § 2310(d), as set forth below, the amount in controversy concerning all claims to be determined in the suit is over $50,000.

10.      This Court has venue pursuant to 28 U.S.C. § 1391(b) in that a substantial portion of the events or omissions giving rise to this action occurred in this District.

## PARTIES

11.      Plaintiff re-alleges paragraphs 1-10 as if fully re-stated herein.

12.      Plaintiff is a natural person who at all relevant times resided in Norristown, Montgomery County, Commonwealth of Pennsylvania.

13.      Upon information and belief, defendant American Heritage Federal Credit Union is a federally-chartered credit union with a principal place of business in Philadelphia County, Commonwealth of Pennsylvania.

14.      Defendant IDD Cars, LLC is a domestic limited liability company with a principal place of business in Rockland County, State of New York.

15.      At all times material hereto and as of the date of the filing of this action, IDD Cars, LLC did and does business as "Volkswagen of Nanuet".

16. At all times material hereto and as of the date of the filing of this action, IDD Cars, LLC dealt and deals in the retail buying and selling of automobiles.

17. At all times material hereto and as of the date of the filing of this action, IDD Cars, LLC was and is authorized by the manufacturer of Volkswagen automobiles to deal in new Volkswagen automobiles.

18. At all times material hereto and as of the date of the filing of this action, the net worth of IDD Cars, LLC is greater than Four Million Dollars ($4,000,000).

19. AHFCU provided plaintiff with a purchase money loan for the purchase of the Vehicle.

<u>FACTUAL ALLEGATIONS</u>

20. Plaintiff re-alleges paragraphs 1-19 as if fully re-stated herein.

21. On or about October 5, 2021, plaintiff saw advertised on the website carfax.com a used 2014 Honda Civic automobile bearing vehicle identification number 19XFB2F51EE256164 (the "Vehicle").

22. In October 2021, the Dealership advertised the Vehicle for sale online.

23. In October 2021, the Dealership advertised the Vehicle for sale on carfax.com.

24. In October 2021, the Dealership caused the Vehicle to be advertised for sale on carfax.com.

25. The Dealership authorized carfax.com to advertise the Vehicle for sale in October 2021.

26. On or about October 5, 2021, plaintiff noticed that the sale price for the Vehicle stated in the advertisement on carfax.com was approximately $12,000.

27. On or about October 5, 2021, the Dealership advertised the Vehicle online for the sale price of approximately $12,000.

28. On or about October 5, 2021, the Vehicle was advertised online for the sale price of approximately $12,000.

29. On October 5, 2021, plaintiff visited the Dealership to view the Vehicle.

30. When plaintiff arrived at the Dealership, he met salesperson Moniceea Boyde ("Moniceea").

31. On October 5, 2021, Moniceea was a salesperson at the Dealership.

32. Moniceea was the salesperson at the Dealership who dealt with plaintiff on October 5, 2021.

33. Moniceea is a salesperson at the Dealership on the date of the filing of this action.

34. Moniceea is an employee at the Dealership on the date of the filing of this action.

35. Plaintiff told Moniceea that he was at the Dealership to view the Vehicle.

36. Moniceea informed plaintiff that the Vehicle was still available for sale.

37. Moniceea showed plaintiff the Vehicle.

38.     Plaintiff viewed the Vehicle.

39.     When plaintiff viewed the Vehicle on October 5, 2021, plaintiff did not see any window sticker on any window of the Vehicle.

40.     At the time plaintiff viewed the Vehicle on October 5, 2021, there was no window sticker on the Vehicle.

41.     At the time plaintiff viewed the Vehicle on October 5, 2021, there was no Buyers Guide attached to any window of the Vehicle.

42.     At the time plaintiff viewed the Vehicle on October 5, 2021, there was no Buyers Guide attached to the Vehicle.

43.      Prior to October 5, 2021, plaintiff had contacted AHFCU for the purpose of obtaining a loan for the purchase of a vehicle.

44.     After viewing the Vehicle, plaintiff decided to purchase the Vehicle and told Moniceea so.

45.     Moniceea then showed plaintiff to her office.

46.     There, Moniceea told plaintiff the price of the Vehicle.

47.     Plaintiff told Moniceea that he had arranged his own financing and did not need financing through the Dealership.

48.     Plaintiff also told Moniceea that he lived in Pennsylvania and that he would need the Vehicle to be registered in Pennsylvania.

49.     Plaintiff also asked Moniceea for the bill of sale because he knew he had to provide that to AHFCU.

50.     Moniceea gave plaintiff a bill of sale which showed that the Dealership sold plaintiff the Vehicle for the price of $12,122.22 before taxes and fees.

51.     The Dealership sold plaintiff the Vehicle for the price of $12,122.22 before taxes and fees.

52.     With taxes and fees, the bill of sale showed the total price of the Vehicle to be $13,602.

53.     The Dealership sold plaintiff the Vehicle for the total price of $13,602, including taxes and fees.

54.     The bill of sale showed plaintiff's down payment or deposit to be $1,102.

55.     The Dealership received a down payment or deposit from plaintiff in the amount of $1,102.

56.     Said bill of sale showed that the Dealership charged plaintiff $969.78 for sales tax.

57.     Said bill of sale showed that the Dealership charged plaintiff $175 for "Doc Fee".

58.     "Doc Fee" means "documentation fee".

59.     Said documentation fee was a fee charged, received and retained by the Dealership.

60.     Said documentation fee was a fee charged, received and retained by the Dealership for its service to submit title and registration paperwork to the DOT on plaintiff's behalf.

61.     The Dealership did not pay over any portion of said documentation fee to any government entity.

62.     Said bill of sale showed that the Dealership charged plaintiff $335 for "license and title".

63.     Said bill of sale showed that the balance of the total purchase price after credit for plaintiff's down payment of $1,102 was $12,500.

64.     A copy of the bill of sale which Moniceea gave to plaintiff is attached hereto as **<u>Exhibit 1</u>**.

65.     Plaintiff agreed with Moniceea that he would pay $500 towards the down payment and that he would pay the $602 remaining on the down payment when he returned to the Dealership with the check for the balance of the purchase price.

66.     Plaintiff gave Moniceea his debit card for the $500 payment.

67.     The Dealership received from plaintiff $500 towards the down payment.

68.     Moniceea spoke with plaintiff's automobile insurance company and secured insurance on the Vehicle for plaintiff.

69.     Moniceea then told plaintiff he had to see the finance manager, and showed plaintiff to the finance manager's office.

70.     There, plaintiff met the finance manager at the Dealership, Stephen Joseph.

71.     On October 5, 2021, Stephen Joseph was a finance manager at the Dealership.

72. On October 5, 2021, Stephen Joseph was the finance manager at the Dealership who dealt with plaintiff.

73. Stephen Joseph is a finance manager at the Dealership on the date of the filing of this action.

74. Stephen Joseph is an employee at the Dealership on the date of the filing of this action.

75. Plaintiff informed Stephen that he resided in Pennsylvania and would therefore be registering the Vehicle in Pennsylvania.

76. Stephen told plaintiff that the Dealership would, on plaintiff's behalf, submit to the Pennsylvania authorities all of the paperwork needed to title, license and register the Vehicle in Pennsylvania.

77. Plaintiff also informed Stephen that he had arranged his own financing for the Vehicle and that he would be returning to the Dealership with the $602 left to be paid of the down payment and with the check for $12,500.

78. Stephen had plaintiff sign on an iPad and some documents on paper.

79. On or about October 6, 2021, plaintiff returned to the Dealership and paid $602 for the remaining portion of the down payment.

80. The Dealership received from plaintiff $602 towards the down payment.

81. Plaintiff then visited AHFCU on October 7, 2021.

82. At AHFCU, plaintiff met with Assistant Branch Manager, Stacy-Ann Hobbs ("Stacy").

83. On October 7, 2021, Stacy was an Assistant Branch Manager at AHFCU.

84. On October 7, 2021, Stacy was the Assistant Branch Manager at AHFCU who dealt with plaintiff.

85. Stacy is an Assistant Branch Manager at AHFCU on the date of the filing of this action.

86. Stacy is an employee at AHFCU on the date of the filing of this action.

87. Plaintiff had been dealing with Stacy in the days leading up to October 7, 2021 concerning obtaining approval of possible financing to buy a vehicle.

88. During the approval process, AHFCU obtained plaintiff's credit report.

89. During the approval process, AHFCU obtained plaintiff's credit score.

90. AHFCU obtained plaintiff's credit report on or about September 27, 2021.

91. AHFCU obtained plaintiff's credit score on or about September 27, 2021.

92. There was no adverse or negative tradeline on plaintiff's credit report when AHFCU obtained plaintiff's credit report on or about September 27, 2021.

93.     Every tradeline on plaintiff's credit report was satisfactory when AHFCU obtained plaintiff's credit report on or about September 27, 2021.

94.     On or about September 27, 2021 when AHFCU obtained plaintiff's credit score, plaintiff's score was greater than 780.

95.     Plaintiff gave Stacy the bill of sale which he had received from the Dealership.

96.     Plaintiff informed Stacy that the required loan amount was $12,500.

97.     Stacy reviewed the bill of sale and informed plaintiff that the Dealership had calculated and charged him sales tax based on the New York state tax rate.

98.     The $969.78 sales tax amount represented a tax rate of almost eight percent.

99.     The applicable sales tax rate in Pennsylvania was six percent or around $737.83.

100.    The Dealership had charged plaintiff approximately $232 more in sales tax than he was required to pay.

101.    In calculating the sales tax, the Dealership did not use the applicable Pennsylvania tax rate.

102.    Stacy informed plaintiff that the Dealership should rectify the error and charge sales tax based on the Pennsylvania tax rate.

103. Plaintiff contacted the Dealership and informed the Dealership that they had overcharged him by charging him at the New York state sales tax rate, instead of at the Pennsylvania rate.

104. The Dealership told plaintiff that they could not change the paperwork.

105. The Dealership further told plaintiff that there was no need for plaintiff to be concerned, because the Dealership would be submitting the title and registration application to Pennsylvania on plaintiff's behalf.

106. Plaintiff did not understand how the Dealership submitting the title and registration application for the Vehicle would remedy the fact that the Dealership had overcharged him on the sales tax, but no-one at the Dealership explained that to plaintiff.

107. Stacy informed plaintiff that AHFCU would give him the loan for $12,500 to purchase the Vehicle.

108. Plaintiff agreed to purchase the extended warranty (or "vehicle service contract") and Guaranteed Asset Protection ("GAP") waiver insurance offered by AHFCU.

109. AHFCU included the price of the extended warranty into plaintiff's loan.

110. AHFCU included the price of the GAP into plaintiff's loan.

111. AHFCU was the seller of the extended warranty included into plaintiff's loan.

112.    AHFCU was the seller of the GAP included into plaintiff's loan.

113.    Stacy then had plaintiff sign certain documents.

114.    Stacy informed plaintiff that his first loan payment was due on November 21, 2021.

115.    Stacy further informed plaintiff that the loan payments would be automatically withdrawn from his deposit account with AHFCU by ACH auto pay.

116.    Stacy did not give plaintiff the option to accept or decline making his loan payments by ACH auto pay; rather Stacy told plaintiff that payment by ACH auto pay "is how it works".

117.    AHFCU gave plaintiff a check in the amount of $12,500 payable to the Dealership.

118.    On October 7, 2021, apart from the $12,500 check for the Dealership, Stacy did not give plaintiff any other document or copies of any of the documents which he signed.

119.    On October 7, 2021, apart from the $12,500 check for the Dealership, no-one at AHFCU gave plaintiff any other document or copies of any of the documents which he signed.

120.    Thereafter, plaintiff returned to the Dealership on October 7, 2021.

121.    There, plaintiff gave the Dealership the $12,500 check.

122.    Stephen again had plaintiff sign documents.

123.    On October 7, 2021, the Dealership gave plaintiff another bill of sale.

124.    A copy of said bill of sale, dated October 7, 2021, is attached hereto as **<u>Exhibit 2</u>**.

125.    Exhibit 2 is substantively identical to Exhibit 1.

126.    On October 7, 2021, the Dealership also gave plaintiff a New York state in-transit, temporary tag and same was affixed to the Vehicle.

127.    The temporary tag was stated to expire on November 2, 2021.

128.    A copy of the temporary tag which the Dealership gave to plaintiff is attached hereto as **<u>Exhibit 3</u>**.

129.    On October 7, 2021, the Dealership did not give plaintiff a copy of several of the documents which he signed.

130.    The Dealership did not give plaintiff a MV-50 Certificate of Sale.

131.    The Dealership did not give plaintiff a Buyers Guide.

132.    The Dealership did not give plaintiff a New York State Lemon Law Warranty.

133.    The Dealership did not give plaintiff a New York State Lemon Law Bill of Rights.

134.    Stephen assured plaintiff once more that the Dealership would handle the submission to Pennsylvania of all the documents required to title and register the Vehicle.

135.    One of the documents required to title and register the Vehicle in Pennsylvania was the existing certificate of title for the Vehicle.

136.     Pursuant to the federal Motor Vehicle Information and Cost Savings Act ("MVICSA"), 49 U.S.C. § 32701 *et seq.,* the Dealership was mandated to present the existing certificate of title for the Vehicle to plaintiff for his examination and execution at the time the Dealership delivered the Vehicle him.

137.     The Dealership delivered the Vehicle to plaintiff on October 7, 2021.

138.     On October 7, 2021, the Dealership did not present to plaintiff the existing certificate of title for the Vehicle as required by MVICSA.

139.     On October 7, 2021, the Dealership did not have in its possession the existing certificate of title for the Vehicle.

140.     Thereafter, plaintiff waited to receive his permanent certificate of registration in the mail from the DOT.

141.     By Pennsylvania law, a dealership is required to submit to the DOT the title and registration application within 20 days after the sale of a vehicle.

142.     By New York law, a dealership is required to submit to the New York Department of Motor Vehicles ("DMV") the title and registration application within five days after the sale of a vehicle.

143.     The existing certificate of title for a vehicle is one of the documents required in Pennsylvania or New York to be submitted by the dealership as a part of the title and registration application paperwork.

144.     As November 2, 2021 drew near and he did not receive his permanent registration and license plate from the DOT, plaintiff began to be concerned.

145. Plaintiff grew concerned because he knew that once the temporary tag expired on November 2, 2021, he could no longer lawfully operate the Vehicle without the registration and license plate from the DOT.

146. Plaintiff telephoned the DOT and inquired as to whether the DOT was processing title and registration paperwork concerning the Vehicle.

147. The DOT informed plaintiff that, "no", it was not processing any paperwork concerning the Vehicle because it had not received any paperwork to process.

148. Plaintiff became more alarmed at that news from the DOT.

149. Plaintiff contacted AHFCU and informed them that he had not received the Pennsylvania registration or license plate for the Vehicle.

150. Plaintiff then inquired of AHFCU whether they had yet received the new certificate of title to the Vehicle from the DOT.

151. AHFCU informed plaintiff that, "no", it had not received the new certificate of title from the DOT.

152. Plaintiff then contacted the Dealership and inquired whether the Dealership had yet submitted to the DOT the title and registration application for the Vehicle.

153. The Dealership told plaintiff that they had not yet submitted any paperwork to the DOT.

154. The Dealership told plaintiff that they were waiting to receive the existing title to the Vehicle in order to submit the title and registration application to the DOT.

155.   This news from the Dealership greatly alarmed plaintiff.

156.   Plaintiff began to realize that the Dealership did not have the title to the Vehicle when the Dealership sold the Vehicle to him.

157.   Plaintiff would not have purchased the Vehicle had he known that the Dealership did not have the existing title to the Vehicle.

158.   Plaintiff purchased the Vehicle from the Dealership because he believed the Dealership had the existing title to the Vehicle in its possession and custody.

159.   Plaintiff became worried that he would be unable to drive the Vehicle after November 2, 2021.

160.   November 2, 2021 came and went and plaintiff did not receive a permanent certificate of registration or a license plate from the DOT.

161.   November 2, 2021 came and went and the Dealership had not submitted the title and registration application to the DOT.

162.   The Dealership did not submit the title and registration application to the DOT on or before November 2, 2021.

163.   After November 2, 2021, plaintiff could not lawfully operate the Vehicle.

164.   The fact that plaintiff was no longer able to operate the Vehicle after November 2, 2021 gravely altered and damaged plaintiff's life.

165.   As of November 2, 2021, the Dealership had not yet submitted any paperwork to the DOT concerning the Vehicle.

166.    As of November 2, 2021, the Dealership had failed to submit any paperwork to the DOT concerning the Vehicle.

167.    As a consequence of the Dealership's failure, as of November 2, 2021, plaintiff had received no certificate of registration from the DOT.

168.    As a consequence of the Dealership's failure, as of November 2, 2021, plaintiff had received no license plate from the DOT.

169.    Further, as of November 2, 2021, the Dealership had still not presented to plaintiff the existing certificate of title for the Vehicle.

170.    As of November 2, 2021, the Dealership had still not presented to plaintiff the existing certificate of title for the Vehicle for plaintiff's examination and execution.

171.    Moreover, as of November 2, 2021, the Dealership had still not submitted the existing certificate of title for the Vehicle to the DOT.

172.    After November 2, 2021, plaintiff continued to contact the Dealership, AHFCU and the DOT about the status of the title and registration application and about the issuance of new title, registration and licensing.

173.    Often when plaintiff telephoned the Dealership, no-one from the Dealership would answer his call.

174.    Plaintiff would leave messages for someone to call him back but the Dealership usually failed to return his call.

175.    When plaintiff did speak with someone at the Dealership he told them that he could not drive the Vehicle as it was not registered or licensed.

176. Plaintiff pointed out to the Dealership that his life was being greatly disrupted by the lack of personal transportation.

177. Plaintiff continued to inquire of AHFCU whether it had received the Vehicle's new certificate of title from the DOT.

178. AHFCU continued to inform plaintiff that it had not received the new title for the Vehicle.

179. AHFCU told plaintiff that it had even contacted the DOT and the DOT told AHFCU that there was no record of any title being processed for the Vehicle.

180. Plaintiff again informed AHFCU that he had not received the Pennsylvania registration or license plate for the Vehicle.

181. Plaintiff later again contacted the DOT and the DOT again informed plaintiff that there was no record of any title or registration paperwork having been submitted concerning the Vehicle.

182. As the days following November 2, 2021 passed, plaintiff became increasingly distressed and distraught at not being able to drive the Vehicle because he did not have his permanent certificate of registration and license plate.

183. Plaintiff felt sick to his stomach daily at the hardships he was forced to endure as a result of the Dealership causing him not to have his own transportation.

184. On or about November 18, 2021, plaintiff telephoned the Dealership yet again and was told that the sales manager, Tausif Raza, would call him back later that day to answer his queries concerning the paperwork for the Vehicle.

185. On November 18, 2021, Tausif Raza was a sales manager at the Dealership.

186. On November 18, 2021, Tausif Raza was an employee at the Dealership.

187. Tausif Raza is a sales manager of the Dealership on the date of the filing of this action.

188. Tausif Raza is an employee of the Dealership on the date of the filing of this action.

189. Tausif did not telephone plaintiff as promised.

190. On November 21, 2021, plaintiff duly made the first loan payment of $429.94 by ACH auto pay from his deposit account with AHFCU.

191. Plaintiff's account statement showing the loan payment on November 21, 2021 is attached hereto as **Exhibit 4**.

192. Plaintiff made said payment under duress, since the vehicle for which he had taken the loan was worthless for being inoperable on the roadway.

193. Plaintiff made the payment in order to protect his high credit rating, which he had been building and for which he had sacrificed much to attain.

194. Plaintiff believed that if he did not make the loan payment, AHFCU would negatively report the loan account to the consumer reporting agencies and thereby ruin his credit rating.

195.    Further, AHFCU withdrew the loan payment by ACH auto pay from his deposit account and plaintiff did not know beforehand that he could stop the withdrawal.

196.    On November 22, 2021, plaintiff emailed Stacy at AHFCU asking her whether anyone there had yet received the new title to the Vehicle.

197.    Later on November 22, 2021, Fred Eldik–who stated that he was the general manager at the Dealership–telephoned plaintiff.

198.    On November 22, 2021, Fred Eldik was the general manager at the Dealership.

199.    On November 22, 2021, Fred Eldik was the general manager at the Dealership who dealt with plaintiff.

200.    Fred Eldik is a general manager at the Dealership on the date of the filing of this action.

201.    Fred Eldik is an employee at the Dealership on the date of the filing of this action.

202.    Fred Eldik told plaintiff that they had done everything possible on their end to get the existing title but that they had not yet received it from the "DMV" to be able to send it to Pennsylvania.

203.    Fred Eldik's statement was further confirmation to plaintiff that the Dealership sold him a Vehicle for which the Dealership was not in possession of the title at the time of sale and delivery to him of the Vehicle.

204.    Plaintiff then informed Fred Eldik that the Dealership had given him only a few documents so he asked Fred Eldik for copies of documents concerning his purchase of the Vehicle.

205.    Fred Eldik promised plaintiff that by the following day he would send to plaintiff copies of all documents concerning his purchase.

206.    Fred Eldik did not send any documents to plaintiff by November 23, 2021.

207.    On November 23, 2021, Stacy emailed plaintiff a response to his November 22, 2021 email, stating:

> I just checked your account and it's not showing we received it yet. We requested it back in October and again in November. Did something happen at the dealership? Did they mention anything about the title when you were there?

208.    On November 23, 2021, plaintiff sent a reply email to Stacy's as follows:

> Yes something happened at the dealership, I've been going back and forth with the dealership for 4 weeks trying to figure out why I don't have the title and why I hype have been forced to have an illegal vehicle with no registration. First they told me there was a delay on their end and now they're telling me that they've done everything possible and they're just waiting on the D M V.

209.    Later on November 23, 2021, Stacy responded to plaintiff by email as follows:

> So, they didn't have the title when they sold you the car? That can't be legal!

Usually, the dealership should have the title to be able to send it to the financing company once a car has been sold. Our title department is following up with them.

210.     On November 23, 2021, plaintiff emailed Stacy again as follows:

I haven't received proof that they had the title available when they sold it to me, and I've been asking for copies of the old title as well as proof that they submitted all the paperwork.  according to them, I signed a power of attorney giving them the right to transfer the title to my name. They are just giving me the run around. And the temporary registration expired on the 2nd of November.

211.     A copy of plaintiff's email exchange with Stacy on November 22 and 23, 2021 is attached hereto as **Exhibit 5**.

212.     Then, on November 29, 2021, plaintiff managed to speak with Fred Eldik again.

213.     Fred Eldik told plaintiff again that the Dealership never had the title to the Vehicle; that the Vehicle was last titled in California and the original title was lost in California; that the Dealership had applied for a duplicate certificate of title from California and he was waiting for the duplicate title to arrive from the DMV so he could submit the required title and registration paperwork to the Pennsylvania DOT.

214.     The Dealership knew it did not have possession of the existing certificate of title when it sold the Vehicle to plaintiff.

215.     Plaintiff was devastated to hear this news from Fred Eldik, because there was no deadline in sight by which he could expect to be able to drive the Vehicle.

216. Greatly anguished and traumatized by the situation the Dealership had placed him in, on December 1, 2021, plaintiff telephoned the Dealership again and asked to speak with Fred Eldik.

217. Plaintiff was told that Fred Eldik was not at work that day and would not be at the Dealership for the remainder of the week.

218. Plaintiff instead spoke with Tausif.

219. Plaintiff told Tausif that he thought the Dealership possessed the existing title to the Vehicle at the time the Dealership sold the Vehicle to him but that Fred Eldik recently told him that the Dealership definitely did not in fact ever have the title and still did not have the title, and that the Vehicle could not be titled or registered in Pennsylvania without the existing title.

220. Plaintiff told Tausif he needed a working car and that the Vehicle was useless to him, with no indication as to when he would be able to operate it legally.

221. Plaintiff told Tausif that as a result, he wished to unwind his purchase of the Vehicle.

222. Plaintiff told Tausif that he would like the Dealership to take back the Vehicle, refund to him his down payment of $1,102 and return to AHFCU the $12,500 payment it had made on plaintiff's behalf for the balance of the purchase price.

223. Plaintiff thus informed Tausif and the Dealership that he was revoking his acceptance of the Vehicle, rescinding the purchase and that he wished all parties to be returned to the positions they were in before he bought the Vehicle.

224.    Tausif told plaintiff, "no", that the loan had "already gone through" so the Dealership would not take back the Vehicle although the Vehicle was inoperable and of no use to plaintiff due to the Dealership's misconduct in not having the title.

225.    The Dealership rejected plaintiff's revocation of acceptance of the inoperable car.

226.    Distressed and frustrated by the Dealership's callousness, plaintiff turned once again to AHFCU for help.

227.    That same day, December 1, 2021, plaintiff contacted and visited AHFCU and spoke with multiple employees there, including Stacy and Takeeia Peterson.

228.    On December 1, 2021, Takeeia Peterson was an Assistant Branch Manager at AHFCU.

229.    On December 1, 2021, Takeeia Peterson was an Assistant Branch Manager at AHFCU who dealt with plaintiff.

230.    Takeeia Peterson is an Assistant Branch Manager at AHFCU on the date of the filing of this action.

231.    Takeeia Peterson is an employee at AHFCU on the date of the filing of this action.

232.    Plaintiff told Stacy that the Dealership told him that they never had and still did not have the title to the Vehicle.

233.    Plaintiff asked Stacy to help extract him, and presumably AHFCU itself, from the predicament into which he had been thrust by the Dealership.

234.     In addition, from the standpoint of AHFCU, the fact that the Dealership did not possess the title on the date the Dealership sold the Vehicle to plaintiff and continuing to December 1, 2021, meant that AHFCU could not obtain the new title for the Vehicle securing the loan which AHFCU made to plaintiff.

235.     Plaintiff told Stacy again that the Vehicle was undriveable and therefore useless to him because of the Dealership's misconduct in selling it to him without having a title, and that he desired to cancel the purchase of the Vehicle and cancel the loan by returning the Vehicle to the Dealership and by AHFCU securing the return of the loan proceeds from the Dealership, or by doing whatsoever it was that AHFCU wished him lawfully to do in order to unwind the purchase and loan transactions.

236.     Stacy responded to plaintiff that AHFCU could not do anything to help him cancel the loan and that there was nothing that AHFCU could do.

237.     Dissatisfied with Stacy's response, plaintiff thereafter spoke with Takeeia Peterson who, after hearing plaintiff's complaint about the Dealership's misconduct and his inability to drive the Vehicle, also told him that there was nothing that AHFCU could do to help him, and that he could not cancel the loan but rather must continue to pay it.

238.    Later that day, Stacy sent an email to plaintiff, informing plaintiff as

follows:

per our conversation

My title department followed up with them and the response is below. I
know you had mentioned the issue with the registration as well so i had her
ask about that as well.

*"Called dealership and spoke w/ sales manager he will contact his title
clerk and get me a date when the title work was sent to NY DMV for
processing. After mentioning regarding the temp registration, he stated that
he can't issue another temp tag bc they are not DMV and they
advised Helder that should he get a ticket then dealership will cover the
costs."*

I also called the local auto tags and they said there are no other options as
far as getting a temporary registration. She said they will be following up
again with the dealership because we need to get the title.

(Emphasis in original.)

239.    A copy of Stacy's said email is attached hereto as **Exhibit 6**.

240.    As can be gleaned from said email, someone in AHFCU's title

department–presumably the department responsible for obtaining, maintaining and

releasing vehicle titles–telephoned the Dealership and spoke with the sales manager there

who claimed that he would contact the Dealership's title clerk and get for AHFCU a date

when the "title work was sent to NY DMV for processing."

241.    No-one from AHFCU has ever informed plaintiff of the date the

Dealership told AHFCU that the Dealership sent the "title work" to the NY DMV.

242. No-one from AHFCU has ever informed plaintiff whether the Dealership ever informed AHFCU of the date the Dealership sent the "title work" to the NY DMV.

243. No-one from AHFCU has ever informed plaintiff why the Dealership would have sent "title work" to the "NY DMV" instead of to the Pennsylvania DOT.

244. No-one from AHFCU has ever informed plaintiff whether AHFCU informed the Dealership that the "title work" should be sent to the Pennsylvania DOT rather than to the NY DMV.

245. Further, according to Stacy's email on December 1, 2021, the person in AHFCU's title department mentioned the temporary registration to the Dealership's sales manager–presumably that it had expired and plaintiff could therefore not drive the Vehicle–and the Dealership's sales manager's response was that the Dealership could not issue another temporary tag and if the police caught plaintiff violating the traffic laws by driving an unregistered and unlicensed car, then the Dealership would "cover the costs" of tickets.

246. Stacy's said email did not mention whether AHFCU inquired of the Dealership how it would eliminate the emotional distress plaintiff would suffer by driving a Vehicle knowing that it was unregistered and unlicensed and, if the inquiry had been made, Stacy's email did not mention what the Dealership's response had been to the inquiry.

247. Further, Stacy's said email did not mention whether AHFCU inquired of the Dealership how it would eliminate the emotional distress plaintiff would suffer in being pulled over by the police and, if the inquiry had been made, Stacy's email did not mention what the Dealership's response had been to the inquiry.

248. Stacy's said email did not mention whether AHFCU requested of the Dealership that the Dealership unwind the sale by accepting plaintiff's return of the Vehicle and then returning to AHFCU the loan proceeds of $12,500 and, if the request had been made, Stacy's email did not mention what the Dealership's response had been to the request.

249. In addition, according to Stacy's said email on December 1, 2021, she had telephoned the "local auto tags" company, which told her that plaintiff could not be provided with another temporary registration tag.

250. Stacy concluded her said email by informing plaintiff that AHFCU would follow up with the Dealership because AHFCU needed to obtain the title to the Vehicle.

251. As of December 1, 2021, Stacy, Takeeia Peterson and at least one person in AHFCU's title department knew that plaintiff had bought a car which was paid for with the proceeds of a loan from AHFCU to plaintiff paid to the Dealership, which car AHFCU knew plaintiff could not drive because it was unregistered and unlicensed due to the Dealership's failure to submit required title paperwork to the DOT.

252. In addition, Stacy was informed of, and knew, these facts before December 1, 2021.

253.    Yet, AHFCU told plaintiff he had to continue to pay the loan even though he could not drive the Vehicle.

254.    AHFCU did not request of the Dealership that it unwind the sale of the Vehicle so as to release plaintiff from the obligation to pay a loan for a Vehicle which AHFCU knew plaintiff was unable to drive through no fault of his own.

255.    AHFCU was content to hold plaintiff to the obligation to pay the loan rather than help him unwind it because it knew that if plaintiff did not continue to pay the loan AHFCU could and would destroy his credit rating by first reporting late payments, then a repossession, then a charged-off account to the credit bureaus.

256.    Plaintiff was shattered by AHFCU's uncaring and predatory treatment of him.

257.    On that day, December 1, 2021, plaintiff realized that Stacy had failed to give him a copy of the documents which she had had him sign on October 7, 2021.

258.    Therefore, plaintiff asked for copies of all the paperwork pertaining to the loan.

259.    Takeeia Peterson gave plaintiff a copy of loan paperwork on December 1, 2021.

260.    This was the first time plaintiff was receiving a copy of these documents from AHFCU.

261.    A copy of the "Loan and Security Agreements and Disclosure Statement" which Takeeia Peterson provided to plaintiff is attached hereto as **Exhibit 7**.

262.   Exhibit 7 is the loan agreement pursuant to which AHFCU required plaintiff to make loan payments to it.

263.   Exhibit 7 is printed on the form of loan agreement which AHFCU utilized for automobile loans to members of the public.

264.   Stacy signed the loan agreement on behalf of AHFCU.

265.   The loan agreement states that the Total Sale Price was $12,500.

266.   The loan agreement states that the Total Sale Price of $12,500 included plaintiff's down payment of $1,102.

267.   The Total Sale Price stated in the loan agreement is inaccurate.

268.   The Total Sale Price was not in fact $12,500.

269.   The Total Sale Price was in fact $16,579.54.

270.   AHFCU's said truth in lending loan disclosure to plaintiff was therefore inaccurate.

271.   In addition, AHFCU's truth in lending loan disclosure states, in pertinent part:

Late Charge:
If Your payment is 15 days or more delinquent, You will be charged 5% of the contract payment due with a minimum charge of $5.00.

272.   The law in Pennsylvania provides that AHFCU may charge a late charge only if plaintiff's payment was *more than 15 days* delinquent. 7 P.S. § 303(d)(v).

273.   Therefore, AHFCU could lawfully charge a late charge only if plaintiff's payment was at least 16 days delinquent.

274.    AHFCU's truth in lending loan disclosure was therefore also inaccurate concerning the Late Charge disclosure.

275.    As can be seen from the loan agreement, the price of the extended warranty was $2,004.

276.    As also can be seen from the loan agreement, the price of the GAP was $299.

277.    Realizing that he was going to obtain no relief from either the Dealership or AHFCU, plaintiff had no choice but to purchase another vehicle.

278.    The following day, December 2, 2021, plaintiff purchased another vehicle.

279.    Because of defendants' misconduct, on December 2, 2021, plaintiff was forced to purchase a used 2009 Toyota Prius.

280.    Because of defendants' misconduct, plaintiff was forced to obtain another loan to purchase the Prius.

281.    The Prius is a car which is five model years older than the Vehicle.

282.    Plaintiff could afford to buy only a car as old as the Prius, because the presence of the AHFCU tradeline on his credit report consumed much of his debt-to-income ratio and prevented him from obtaining a loan in an amount large enough for him to buy a newer model car.

283.    The total sale price of the Prius was $7,105.04, with plaintiff being obliged to repay the loan at the rate of $275.21 per month.

284. A copy of the first page of the retail installment contract for the loan for the Prius is attached hereto as **Exhibit 8**.

285. On December 2, 2021, plaintiff's credit score when he purchased the Prius was 772.

286. A copy of plaintiff's said credit score of 772 is attached hereto as **Exhibit 9**.

287. Plaintiff's credit score had been lowered by the hard inquiry which AHFCU had made on his credit file on or about September 27, 2021.

288. AHFCU's hard inquiry and the resulting lowering of his credit score damaged plaintiff's credit rating with no concomitant benefit, since the Vehicle he had purchased with the AHFCU loan was undriveable.

289. Because plaintiff had timely made the first loan payment to AHFCU on November 21, 2021 and the second loan payment was not due until December 21, 2021, AHFCU had made no negative report to the credit bureaus as of December 2, 2021 when plaintiff purchased the Prius.

290. Unable to rest with the threat of AHFCU damaging his credit score due to his inability to continue to pay the loan, on or about December 15, 2021, plaintiff contacted AHFCU and again spoke with Takeeia Peterson.

291. Plaintiff again asked Takeeia Peterson if AHFCU would release him from the loan obligation in view of his inability to drive the unregistered and untitled Vehicle, which release, plaintiff told Takeeia Peterson would allow him to stop paying the loan without AHFCU damaging his credit rating.

292.     Plaintiff told Takeeia Peterson that he would turn the Vehicle over to AHFCU or return the Vehicle to the Dealership, as AHFCU instructed.

293.     In this manner, plaintiff validly rescinded the loan agreement between plaintiff and AHFCU.

294.     However, Takeeia Peterson disregarded plaintiff's rescission and again told plaintiff that he must continue to repay the loan to AHFCU, that it did not matter that the Vehicle was undriveable, and that there was nothing AHFCU could do to help him out of his predicament.

295.     Thereafter, in or around the middle of January 2022, AHFCU contacted plaintiff, told him he was late on his loan payments, and asked plaintiff when he would be making payments.

296.     Plaintiff informed AHFCU that, as AHFCU already knew, the Vehicle was undriveable due to not being registered or licensed.

297.     AHFCU did not inform plaintiff as to whether it had had any communication with the Dealership after December 1, 2021, and did not inform plaintiff about the contents of any such communication.

298.     Nevertheless, in January 2022, AHFCU reported plaintiff's loan account as late to plaintiff's credit file with the consumer reporting agencies.

299.     In January 2022, AHFCU reported plaintiff's loan account as late to plaintiff's credit file with the consumer reporting agencies.

300.     Nevertheless, in February 2022, AHFCU reported plaintiff's loan account as late to plaintiff's credit file with the consumer reporting agencies.

301.   In February 2022, AHFCU reported plaintiff's loan account as late to plaintiff's credit file with the consumer reporting agencies.

302.   AHFCU's reporting of late payments to plaintiff's credit file lowered plaintiff's credit score.

303.   AHFCU's reporting of late payments to plaintiff's credit file was unfair, deceptive and abusive towards plaintiff.

304.   The AHFCU loan account for the Vehicle became the sole negative tradeline on plaintiff's credit report.

305.   Thereafter, AHFCU contacted plaintiff repeatedly, informing him each time that the loan was in default and requesting that he repay the loan even though AHFCU knew that he was still unable to drive the Vehicle because the Dealership had failed to submit required paperwork to the DOT.

306.   AHFCU also knew that it had refused to assist plaintiff in causing the Dealership to unwind the purchase.

307.   Each time AHFCU contacted plaintiff he felt beleaguered, harassed, abused and tormented by AHFCU's insistence that he pay for a car which AHFCU knew he could not drive through no fault of his.

308.   For example, on or about February 5, 2022, plaintiff spoke with Melissa who said she worked in the collections department at AHFCU.

309.   On February 5, 2022, Melissa spoke with plaintiff.

310.   On February 5, 2022, Melissa worked in the collections department at AHFCU.

311.    On the date of the filing of this action, Melissa is an employee at AHFCU.

312.    Melissa informed plaintiff that AHFCU had still not received the title to the Vehicle and that AHFCU would notify plaintiff if it ever did.

313.    Melissa also informed plaintiff that AHFCU was aware that the Vehicle was of no use to him due to the temporary registration having expired.

314.    Nevertheless, Melissa asked plaintiff to resume making loan payments because, "now you're in delinquency and that is not helping the situation either."

315.    Among the threats which AHFCU made to plaintiff, AHFCU told plaintiff that if he did not pay the loan AHFCU would repossess the Vehicle and report the repossession to the credit bureaus, thereby further damaging plaintiff's credit score.

316.    On or about February 24, 2022, AHFCU did repossess the Vehicle.

317.    Thereafter, true to its word, AHFCU reported the repossession to plaintiff's credit file with the consumer reporting agencies.

318.    AHFCU reported the repossession to plaintiff's credit file with the consumer reporting agencies.

319.    AHFCU's said reporting of the repossession to plaintiff's credit file was unfair, deceptive and abusive towards plaintiff.

320.    As a result of AHFCU's said reporting, plaintiff's credit score fell precipitously.

321.    In April 2022, plaintiff desired to obtain a home loan in order to acquire stable housing.

322.    As a prelude to his search for a home loan, plaintiff decided to check his credit score.

323.    This was when plaintiff realized just how far his credit score had fallen as a result of AHFCU's aforesaid negative credit reporting.

324.    By April 4, 2022, as a result of AHFCU's negative credit reporting to the consumer reporting agencies, plaintiff's credit score with TransUnion consumer reporting agency fell by 184 points from 788 to 604, as shown attached hereto as **<u>Exhibit 10</u>**.

325.    By April 4, 2022, as a result of AHFCU's negative credit reporting to the consumer reporting agencies, plaintiff's credit score with Equifax consumer reporting agency fell by 162 points from 788 to 626, as shown attached hereto as **<u>Exhibit 11</u>**.

326.    By April 4, 2022, as a result of AHFCU's negative credit reporting to the consumer reporting agencies, plaintiff's credit score with Experian consumer reporting agency fell to 601, as shown attached hereto as **<u>Exhibit 12</u>**.

327.    In furtherance of his intention to purchase a home, plaintiff inquired of at least two different mortgage lenders.

328.    Plaintiff was informed that he needed to have a credit score of at least 720 to qualify for a mortgage.

329.     Plaintiff was also informed that his credit score needed to be at least 680 to qualify for a mortgage.

330.     Plaintiff was informed that he did not qualify for a mortgage with his aforesaid credit scores in the low 600s.

331.     Plaintiff was repeatedly denied the opportunity to obtain a mortgage and with it, stable housing.

332.     In May 2022, AHFCU mailed to plaintiff an Explanation of Calculation of Deficiency letter ("Deficiency Letter") dated May 13, 2022.

333.     Plaintiff received said Deficiency Letter.

334.     A copy of AHFCU's Deficiency Letter is attached hereto as **Exhibit 13**.

335.     AHFCU states in the Deficiency Letter that it sold the Vehicle for $9,000.

336.     AHFCU states in the Deficiency Letter that it deducted the proceeds of sale of $9,000 from the aggregate debt.

337.     Apart from said $9,000, AHFCU does not state in the Deficiency Letter that AHFCU deducted any additional sum from the aggregate debt.

338.     In the Deficiency Letter, AHFCU does not list any "Credits" in Item 5.

339.     In the Deficiency Letter, AHFCU states that it added "Disposition expenses" to the "Amount of Deficiency".

340. In the Deficiency Letter, AHFCU states that the Amount of Deficiency was $5,906.35.

341. Further, in the Deficiency Letter, AHFCU states that it had reported information to the credit bureaus (consumer reporting agencies) regarding late payments, missed payments or other defaults on plaintiff's account, which information may be reflected on plaintiff's credit report.

342. By June 8, 2022, as a result of AHFCU's negative credit reporting to the consumer reporting agencies, plaintiff's credit score with Equifax consumer reporting agency fell from 626 to 617, as shown attached hereto as **Exhibit 14**.

343. Thereafter, in July 2022, AHFCU mailed to plaintiff a Notice of Default dated July 1, 2022.

344. Plaintiff received said Notice of Default.

345. A copy of said Notice of Default is attached hereto as **Exhibit 15**.

346. In the Notice of Default, AHFCU states, in relevant part:

Principal Amount Due $5,906.35
Unpaid Interest Due $215.11
Total Amount Due $6,121.46.

347. In the Notice of Default, AHFCU states that plaintiff's loan had been "CHARGED-OFF as of 06/29/2022".

348. In the Notice of Default, AHFCU does not deduct any sum from the Principal Amount Due.

349. In the Notice of Default, AHFCU does not credit any sum towards the Principal Amount Due.

350. Prior to July 1, 2022, the extended warranty which AHFCU sold to plaintiff had been cancelled.

351. After the cancellation of the extended warranty, AHFCU received a refund of a portion of the $2,004.46 purchase price of the extended warranty.

352. AHFCU received a refund of the purchase price of the extended warranty.

353. AHFCU has never credited a refund to the Principal Amount Due.

354. AHFCU has never credited any portion of a refund to the Principal Amount Due.

355. AHFCU has never credited any portion of any refund of the purchase price of the extended warranty to the Principal Amount Due.

356. By law, AHFCU should have credited any refund of the purchase price of the extended warranty to the Principal Amount Due.

357. Prior to July 1, 2022, the GAP which AHFCU sold to plaintiff had been cancelled.

358. After the cancellation of the GAP, AHFCU received a refund of a portion of the $299 purchase price of the GAP.

359. AHFCU received a refund of the purchase price of the GAP.

360. AHFCU has never credited a refund to the Principal Amount Due.

361. AHFCU has never credited any portion of a refund to the Principal Amount Due.

362. AHFCU has never credited any portion of any refund of the purchase price of the GAP to the Principal Amount Due.

363. By law, AHFCU should have credited any refund of the purchase price of the GAP to the Principal Amount Due.

364. Further, in the Notice of Default, AHFCU states that it may report information about plaintiff's account to credit bureaus and that late payments, missed payments or other defaults on plaintiff's account may be reflected on plaintiff's credit report.

365. Thereafter, in or around July 2022, AHFCU began to report the charged-off status of the loan account to plaintiff's credit file with the consumer reporting agencies.

366. AHFCU reported the charged-off status of the loan account to plaintiff's credit file with the consumer reporting agencies.

367. AHFCU's said reporting of the charged-off status of the loan account to plaintiff's credit file was unfair, deceptive and abusive towards plaintiff.

368. Further, in or around July 2022, AHFCU began to report a charged-off balance of $6,121 to plaintiff's credit file with the consumer reporting agencies.

369. AHFCU reported a charged-off balance of $6,121 to plaintiff's credit file with the consumer reporting agencies.

370. AHFCU's said reporting of a charged-off balance of $6,121 to plaintiff's credit file with the consumer reporting agencies was unfair, deceptive and abusive towards plaintiff.

371.    On February 13, 2023, plaintiff obtained his credit report with TransUnion consumer reporting agency.

372.    A copy of AHFCU's negative tradeline on said credit report is attached hereto as **Exhibit 16**.

373.    In order to improve his credit score to put himself in the best position to obtain another loan, plaintiff timely paid the loan on the Prius each month and paid off said loan early.

374.    Plaintiff needed another loan to improve the quality of his and his loved ones' lives and welfare.

375.    In March 2023, plaintiff applied to Pennsylvania State Employees Credit Union ("PSECU") for a personal loan of a modest amount.

376.    PSECU was the creditor for the Prius loan, to which plaintiff had made excellent repayment of said loan.

377.    Nevertheless, due to AHFCU's misconduct in destroying plaintiff's credit rating, PSECU denied plaintiff's application for the small loan.

378.    PSECU denied plaintiff's loan application because of the presence of AHFCU's negative tradeline on plaintiff's credit report.

379.    PSECU also denied plaintiff's loan application because of plaintiff's credit score.

380.    When PSECU obtained plaintiff's credit score, said score was 678.

381.	The rise in plaintiff's credit score was due to plaintiff's timely repayment of his credit accounts, but the rise in score was not enough to qualify plaintiff for a loan with PSECU.

382.	Plaintiff's credit score was not substantially higher than 678 because of AHFCU's negative tradeline on his credit report.

383.	A copy of the Adverse Action–Statement of Credit Denial Notice which PSECU provided to plaintiff evidencing the reasons for PSECU's denial of credit is attached hereto as **Exhibit 17**.

384.	Plaintiff was devastated at PSECU's said denial of credit, caused solely by AHFCU's misconduct.

385.	To the date hereof, plaintiff remains distressed at PSECU's said denial of credit, caused solely by AHFCU's misconduct.

386.	AHFCU never refunded to plaintiff his loan payment of $429.94 which he paid to AHFCU in November 2021.

387.	Plaintiff never received the permanent certificate of registration for the Vehicle.

388.	Plaintiff never received a license plate for the Vehicle.

389.	AHFCU has never informed plaintiff that it ever received a new certificate of title for the Vehicle from the DOT.

390.	The Dealership never submitted the existing certificate of title for the Vehicle to the DOT.

391.    The Dealership has sold automobiles to other members of the public and failed timely to submit the application for title and registration to the state department of motor vehicles, thereby resulting in buyers not timely receiving registration and license plates.

392.    A copy of a complaint of one such buyer is attached hereto as **Exhibit 18**.

393.    On June 5, 2023, plaintiff obtained his credit report with Experian consumer reporting agency.

394.    A copy of AHFCU's negative tradeline on said credit report is attached hereto as **Exhibit 19**.

395.    To the date hereof, AHFCU continues to report its negative tradeline to plaintiff's credit file with the consumer reporting agencies.

396.    Plaintiff has missed out on opportunities for his and his loved ones' advancement because his credit rating disqualifies him from obtaining new credit.

397.    Due to defendants' misconduct, plaintiff lost the use and enjoyment of his personal transportation during the coronavirus pandemic, and defendants have inflicted and continue to inflict on plaintiff grave misery, causing plaintiff to suffer loss of credit, loss of financial opportunity, loss of enjoyment of life, emotional anxiety, hardship, frustration, distress, stress, sleeplessness, loss of concentration, stomach upset, loss of money, loss of the value of money and loss of time.

# ALLEGATIONS AGAINST THE DEALERSHIP

## AS AND FOR A FIRST CAUSE OF ACTION

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., NYUCC § 2-312

and NYUCC § 2-314

(Breach Of Warranty Of Title And Warranty Of Merchantability)

398.    Plaintiff re-alleges paragraph 1-397 as if fully re-stated herein.

399.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq*.

400.    The Dealership is a "warrantor" within the meaning of the MMWA.

401.    The Vehicle is a "consumer product" within the meaning of the MMWA.

402.    Plaintiff is a "buyer" within the meaning of New York Uniform Commercial Code ("NYUCC").

403.    The Dealership is a "seller" within the meaning of NYUCC.

404.    The Dealership is a "merchant" within the meaning of NYUCC.

405.    The Vehicle is a "good" within the meaning of NYUCC.

406.    Under NYUCC § 2-312 there arises in every contract for sale a warranty by the seller that the title conveyed to the buyer shall be good and its transfer rightful, and that the good shall be delivered free of any security interest, lien or other encumbrance of which the buyer at the time of contracting has no knowledge.

407.    Under NYUCC § 2-314, a warranty that goods shall be merchantable is implied in a contract for their sale.

408. Under NYUCC § 2-314, among other listed conditions, goods to be merchantable must be at least such as pass without objection in the trade under the contract description and are fit for the ordinary purposes for which such goods are used.

409. Under NYUCC § 2-312, the warranty of title arose in the Dealership's sale of the Vehicle to plaintiff.

410. Under NYUCC § 2-314, the warranty that the Vehicle was merchantable was implied in the Dealership's sale of the Vehicle to plaintiff.

411. The Dealership breached the warranty of title under NYUCC § 2-312 in that the Dealership did not have title to the Vehicle at the time the Dealership delivered the Vehicle to plaintiff.

412. In addition or in the alternative, the Dealership breached the warranty of title under NYUCC § 2-312 in that the Dealership did not have in its possession the certificate of title to the Vehicle at the time the Dealership delivered the Vehicle to plaintiff.

413. Plaintiff bought the Vehicle on October 7, 2021 but the Dealership never submitted the existing certificate of title to the DOT.

414. Plaintiff bought the Vehicle on October 7, 2021 but the Dealership never submitted to the DOT the application for a new certificate of title.

415. The Dealership did not deliver any title to plaintiff at the time of delivery of the Vehicle.

416. Due to its breach of the warranty of title, the Dealership rendered the Vehicle of zero value, because no reasonable purchaser would have bought the Vehicle from plaintiff knowing that plaintiff had no title to pass.

417. Due to its breach of the warranty of title, the Dealership rendered the Vehicle of zero value, because no reasonable purchaser would have bought the Vehicle from plaintiff knowing that plaintiff had no certificate of title to deliver.

418. Further, due to the Dealership's breach of the warranty of title, plaintiff never knew, and would never have known, when a person with a superior claim to the Vehicle would surface and claim ownership of it, so plaintiff never enjoyed and might never have enjoyed quiet title to the Vehicle.

419. The Dealership's breach of the warranty of title was fraudulent in nature, egregious, in bad faith, wanton or malicious, or was reckless or grossly negligent and part of a pattern directed at the public generally and plaintiff is entitled to an award of punitive damages in addition to compensatory damages.

420. In addition, the Dealership breached the warranty of merchantability under NYUCC § 2-314 in that the Vehicle was not merchantable at the time the Dealership delivered the Vehicle to plaintiff.

421. At the time the Dealership delivered the Vehicle to plaintiff, the Dealership did not have title to the Vehicle.

422. In addition or in the alternative, the Dealership did not have in its possession the certificate of title to the Vehicle at the time the Dealership delivered the Vehicle to plaintiff.

423. A vehicle without a title would not pass without objection in the trade.

424. The Vehicle would therefore not pass without objection in the trade, in violation of the warranty of merchantability.

425. A vehicle without a title is not fit for the ordinary purposes for which a vehicle is used.

426. The Vehicle was therefore not fit for the ordinary purposes for which a vehicle is used, in violation of the warranty of merchantability.

427. In addition, after the Dealership sold him the Vehicle on October 7, 2021, plaintiff never received a permanent certificate of registration or a license plate.

428. After fewer than four weeks of plaintiff being able to operate the Vehicle with the temporary tag, the Vehicle became inoperable on the public roadway after November 2, 2021 for want of lawful registration and license, and plaintiff was unable to drive it.

429. A vehicle that cannot be driven for want of lawful registration and license would not pass without objection in the trade.

430. A vehicle that cannot be driven for want of lawful registration and license would not be fit for the ordinary purposes for which a vehicle is used.

431. The Dealership's sale to plaintiff of a vehicle that became inoperable on the public roadway after November 2, 2021 for want of lawful registration and license constituted a breach of the warranty of merchantability by the Dealership.

432. Due to its breach of the warranty of merchantability, the Dealership rendered the Vehicle of zero value, because no reasonable purchaser would have bought the Vehicle from plaintiff knowing that the Vehicle was inoperable for want of lawful registration and license.

433. The Dealership's breach of the warranty of merchantability was fraudulent in nature, egregious, in bad faith, wanton or malicious, or was reckless or grossly negligent and part of a pattern directed at the public generally and plaintiff is entitled to an award of punitive damages in addition to compensatory damages.

434. The Dealership's aforesaid breach of the warranty of title constitutes a breach of the MMWA.

435. The Dealership's aforesaid breach of the warranty of merchantability constitutes a breach of the MMWA.

436. The Dealership is liable to plaintiff for actual pecuniary damages totaling at least $36,786.58, comprising the price, fees and charges for plaintiff's purchase of the two vehicles and statutory damages: ($16,579.54 + $7,105.04 + $12,000+$1,102), but not including common-law damages and damages alleged against AHFCU under the UTPCPL.

437. In addition, the Dealership is liable to plaintiff for actual non-pecuniary or compensatory damages of no less than $90,000.

438. In addition, the Dealership is liable to plaintiff for punitive damages of no less than three times compensatory damages.

439.     In addition, the Dealership is liable to plaintiff for incidental and consequential damages.

440.     The Dealership is moreover liable to plaintiff for reasonable attorneys' fees, costs and disbursements in accordance with the MMWA § 2310(d).

## AS AND FOR A SECOND CAUSE OF ACTION

(Common-Law Fraud)

441.     Plaintiff re-alleges paragraph 1-440 as if fully re-stated herein.

442.     Through the warranty of title, NYUCC § 2-312, the Dealership represented to plaintiff at the time it delivered the Vehicle to plaintiff that it possessed good title to the Vehicle and that it had possession of the certificate of title to the Vehicle.

443.     Through the warranty of merchantability, NYUCC § 2-314, the Dealership represented to plaintiff at the time it delivered the Vehicle to plaintiff that the Vehicle was merchantable in that it would pass without objection in the trade and was fit for the ordinary purposes for which it was to be used.

444.     As alleged above, the Dealership's representation that it possessed good title to the Vehicle and that it had possession of the certificate of title to the Vehicle was false.

445.     As alleged above, the Dealership's representation that the Vehicle was merchantable in that it would pass without objection in the trade and was fit for the ordinary purposes for which it was to be used was false.

446. The Dealership's representation that it possessed good title to the Vehicle was false because the Dealership did not possess good title to the Vehicle at the time it delivered the Vehicle to plaintiff.

447. The Dealership's representation that it had possession of the certificate of title to the Vehicle was false because the Dealership did not have possession of the title to the Vehicle at the time it delivered the Vehicle to plaintiff.

448. The Dealership's representation that the Vehicle was merchantable in that it would pass without objection in the trade and was fit for the ordinary purposes for which it was to be used was false because at the time of the Dealership's delivery of the Vehicle to plaintiff the Dealership did not possess the certificate of title to the Vehicle and, in addition, the Dealership's lack of the certificate of title caused the Vehicle to become inoperable for want of valid registration and license.

449. The Dealership had actual knowledge that aforesaid representations were false at the time it made the representations to plaintiff.

450. The Dealership acted with deliberate ignorance whether aforesaid representations were false at the time it made the representations to plaintiff.

451. The Dealership acted with reckless disregard whether aforesaid representations were false at the time it made the representations to plaintiff.

452. At the time the Dealership made the said representations to plaintiff, plaintiff did not know that the representations were false.

453. Plaintiff would not have purchased the Vehicle had he known that the Dealership's said representations were false.

454. The Dealership made the representations for the purpose of inducing plaintiff to rely on them and proceed with the purchase of the Vehicle.

455. The Dealership knew that plaintiff would not have purchased the Vehicle had plaintiff known, at the time of sale or delivery, that the Dealership did not have good title to the Vehicle, did not have possession of the certificate of title to the Vehicle and that the Vehicle was not merchantable.

456. Plaintiff did reasonably, justifiably and rightfully rely on the Dealership's said representations when he purchased and took delivery of the Vehicle.

457. Plaintiff was gravely damaged by the Dealership's said false representations.

458. The Dealership is liable to plaintiff for actual, compensatory and punitive damages in an amount to be determined at the time of trial.

459. Plaintiff was gravely damaged by the fraud of the Dealership which rendered the Vehicle of no use to plaintiff, causing plaintiff much anguish as alleged above; plaintiff justly revoked his acceptance of the Vehicle and rescinded the purchase documents but the Dealership refused to honor his legal rights which resulted in destruction of plaintiff's credit rating; the Dealership's refusal to honor plaintiff's revocation and rescission has so far caused plaintiff to lose the use of his $1,102 in down payment and his $429.94 in loan payment which he made to AHFCU.

## **Punitive Damages For Fraud**

460.    The Dealership's aforesaid fraudulent conduct evinces bad faith, was wanton and malicious, outrageous and unconscionable, and was undertaken with intent to harm plaintiff or was so grossly negligent or reckless as to evince utter disregard for the legal rights of plaintiff, entitling plaintiff to punitive damages against the Dealership. At all relevant times, the Dealership's misconduct was not aimed and practiced against plaintiff only, but was aimed and practiced against other members of the public seeking to purchase an automobile from the Dealership.

## AS AND FOR A THIRD CAUSE OF ACTION

NYGBL § 349–Deceptive Acts And Practices

461.    Plaintiff re-alleges paragraphs 1-460 as if fully re-stated herein.

462.    The Dealership owed a duty to plaintiff to transact business with plaintiff with reasonable care.

463.    Under the aforesaid warranty of title, the Dealership also owed plaintiff a duty to transfer to him good title to the Vehicle at the time of delivery of the Vehicle.

464.    Under the aforesaid warranty of merchantability, the Dealership further owed plaintiff a duty to transfer to him a Vehicle that was merchantable at the time of delivery of the Vehicle.

465.    The Dealership breached each duty to plaintiff.

466.    The Dealership breached each duty to plaintiff by deceptively: (i) selling to plaintiff the Vehicle knowing that it did not have good title to the Vehicle; (ii) selling to plaintiff the Vehicle knowing that it did not have the existing certificate of title to the Vehicle; (iii) selling to plaintiff the Vehicle knowing that it was not merchantable in that it would not pass without objection in the trade and was not fit for the ordinary purposes for which it was to be used; (iv) failing to provide to plaintiff a MV-50 Certificate of Sale; (v) failing to display a Buyers Guide on the Vehicle while offering the Vehicle for sale or for inspection by a consumer, in contravention of the Federal Trade Commission Used Car Rule and the MMWA; (vi) failing to provide to plaintiff a Buyers Guide for the Vehicle; (vii) failing to provide to plaintiff a New York State Lemon Law Warranty; (viii) failing to provide to plaintiff a New York State Lemon Law Bill of Rights; (ix) charging plaintiff sales tax at a rate higher than the appropriate rate, resulting in sales tax charged of $969.78; (x) charging plaintiff $175 in documentation fee but failing to submit title and registration application to the DOT; (xi) extracting from plaintiff $335 in "license and title" fee but failing to submit title and registration application to the DOT; (xii) failing to return to plaintiff his $1,102 down payment despite plaintiff's requests therefor.

467.    The Dealership's said acts and practices were deceptive on their face.

468.    Said deceptive acts and practices were committed by the Dealership in the conduct of a business, trade or commerce or the furnishing of a service within the State of New York and constitute a violation of NYGBL § 349.

469. The Dealership's deceptive acts and practices were consumer-oriented.

470. The Dealership's deceptive acts and practices were consumer-oriented in that the Dealership's aforesaid misconduct in its business practices was not limited to plaintiff but extended to the Dealership's practices with other consumers.

471. The Dealership's deceptive acts and practices were recurring and directed at consumers at large or said acts and practices were the sort that, at all material times, the Dealership performed on a routine basis in its business of selling automobiles and were the sort that did harm similarly-situated consumers.

472. The Dealership's deceptive acts and practices were such as were capable of harming other consumers who purchased automobiles from the Dealership, in that the Dealership treated plaintiff no differently from how the Dealership treated other consumers who purchased automobiles from the Dealership.

473. As exemplified by Exhibit 18, other consumers have fallen prey to the Dealership's practice of selling automobiles for which the Dealership failed timely to submit title and registration application to the relevant state department of motor vehicles.

474. The Dealership's aforesaid acts and practices have a broader impact on consumers at large who purchase automobiles from the Dealership.

475. The Dealership's aforesaid acts and practices were also deceptive in a material way, as alleged above.

476. Plaintiff has been injured as a result of the Dealership's misconduct.

477.    By reason of the Dealership's aforesaid misconduct, plaintiff suffered and continues to suffer financial and emotional harm as alleged above.

478.    The Dealership has improperly profited from its deceptive acts and practices and has retained said profits.

479.    Plaintiff is a reasonable consumer within the meaning of the NYGBL and acted reasonably under the circumstances of this case.

480.    The Dealership violated NYGBL § 349(a) and is liable to plaintiff under NYGBL § 349(h).

481.    The Dealership acted willfully and knowingly in its misconduct herein.

482.    As a result of the above violations, plaintiff seeks against the Dealership and the Dealership is liable to plaintiff for actual, compensatory, treble and punitive damages in an amount to be determined at the time of trial, and reasonable attorneys' fees, costs and disbursements.

AS AND FOR A FOURTH CAUSE OF ACTION

CONVERSION

483.    Plaintiff re-alleges paragraphs 1-482 as if fully re-stated herein.

484.    Plaintiff paid $1,102 to the Dealership as down payment for the purchase of the Vehicle.

485.     After the Dealership failed to submit the title and registration application to the DOT so he could operate the Vehicle, plaintiff validly demanded return of the $1,102 down payment.

486.     The Dealership refused, failed and neglected to return the $1,102 to plaintiff.

487.     By its refusal, failure and neglect to return the $1,102 to plaintiff, the Dealership intentionally and without authority assumed and exercised dominion and control over the $1,102 in derogation of plaintiff's superior rights.

488.     Even if the Dealership's possession of the $1,102 were initially lawful, said possession became unlawful when the Dealership refused, failed and neglected to heed plaintiff's demands for the return of the $1,102, as aforesaid.

489.     The Dealership knew plaintiff was entitled to rescind the sale transaction due to fraud and obtain a return of his $1,102 down payment.

490.     Knowing that plaintiff could not lawfully operate the Vehicle because of the Dealership's unlawful sale to him of the Vehicle without having a certificate of title for it, the Dealership's retention of plaintiff's $1,102 down payment despite plaintiff's demands therefor was improper.

491.     The Dealership's improper retention of the $1,102 unlawfully interfered with plaintiff's rights to dominion and control over the $1,102 and constitutes conversion.

492.     The Dealership's conversion of the $1,102 caused plaintiff financial loss and emotional harm, as alleged above.

493.     As a retail car dealer, the Dealership should have known that it had no lawful right to retain the $1,102.

494.     Plaintiff is entitled to actual, compensatory and incidental damages against the Dealership for conversion.

495.     The Dealership's conversion of the $1,102 was gross, wanton and deliberate and demonstrates a high degree of moral culpability so flagrant as to transcend mere carelessness, and constitutes willful and gross negligence or recklessness so as to justify an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT

496.     Plaintiff re-alleges paragraphs 1-495 as if fully re-stated herein.

497.     Plaintiff paid $1,102 in down payment to the Dealership.

498.     The Dealership has retained said $1,102.

499.     As alleged more fully above, the Dealership has retained said sum and failed and refused to return same to plaintiff despite plaintiff's demand therefor, and plaintiff has lost the use thereof.

500.     The Dealership has thus been enriched at plaintiff's expense.

501.     It is against equity and good conscience to permit the Dealership to retain said sum which plaintiff paid to the Dealership as a result of the Dealership's aforesaid fraudulent and deceptive acts and practices.

502.     The $1,102 should be restored to plaintiff.

503. The Dealership has been unjustly enriched as a result of plaintiff's payment of the $1,102 to the Dealership and the Dealership is liable to plaintiff in damages for said unjust enrichment.

504. The Dealership acted willfully and knowingly in its misconduct.

## ALLEGATIONS AGAINST AHFCU

### AS AND FOR A SIXTH CAUSE OF ACTION

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")

73 P.S. § 201-1, *et seq*.

505. Plaintiff re-alleges paragraphs 1-504 as if fully re-stated herein.

506. AHFCU owed a duty to plaintiff to transact business with him with reasonable care.

507. AHFCU had a duty to plaintiff not to engage in fraudulent or deceptive conduct towards him.

508. AHFCU breached its duty to plaintiff.

509. AHFCU breached each duty to plaintiff by, among other things, deceptively: (i) failing to credit to plaintiff's loan balance any portion of the purchase price refunded to AHFCU after the cancellation of the extended warranty; (ii) failing to credit to plaintiff's loan balance any portion of the purchase price refunded to AHFCU after the cancellation of the GAP; (iii) informing plaintiff that the total sale price of the Vehicle was $12,500 when the total sale price was in fact $16,579.54; (iv) informing plaintiff that the only way the loan works is if AHFCU receives payments by ACH

automatic payments directly from his deposit account and that he could not make one-time payments as the payments fall due; (v) informing plaintiff that AHFCU would charge a late charge if plaintiff's loan payment was 15 days or more delinquent; (vi) charging plaintiff a late charge when plaintiff's loan payment was 15 days delinquent; (vii) informing plaintiff that he had to continue to pay the loan despite the Vehicle being inoperable and that there was nothing AHFCU could do to help him obtain the title to the Vehicle so that he could obtain the registration and license, or to release him from the loan obligation; and (viii) after knowing plaintiff could not lawfully operate the Vehicle for want of registration and license, reporting its loan to the consumer reporting agencies first as late, then as a repossession and then as charged-off, thereby destroying plaintiff's credit score from a high of no less than 788 to a low of 601 or less, causing plaintiff to be denied credit opportunities.

510.    Plaintiff justifiably relied on the said statements, actions and omissions of AHFCU.

511.    As alleged more fully above, as result of AHFCU's misconduct plaintiff suffered and continues to suffer harm and ascertainable loss, financial damages, loss of credit opportunity to better himself, emotional anguish and a sense misery, stomach upset, humiliation, embarrassment and other hardships, some of which are yet to be determined.

512.    Under the UTPCPL, plaintiff is entitled to three times actual damages but not less than $100 for each above-mentioned violation.

513.    As a result of the above violations, plaintiff seeks against AHFCU and AHFCU is liable to plaintiff for actual, compensatory, treble and punitive damages in an amount to be determined at the time of trial, and reasonable attorneys' fees, costs and disbursements.

<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>

DECLARATORY RELIEF

514.    Plaintiff re-alleges paragraphs 1-513 as if fully re-stated herein.

515.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

516.    An actual controversy has arisen between plaintiff and AHFCU as to the rights, duties, responsibilities and obligations of the parties.

517.    Specifically, plaintiff contends, and presumably AHFCU disputes and deny, the following:

(a)      The loan agreement between plaintiff and AHFCU failed of its essential purpose because the Vehicle which the loan was used to purchase was inoperable for want of title, registration and license;

(b)      On or about December 15, 2021, plaintiff validly rescinded the loan agreement with AHFCU due to fraud;

(c)      Plaintiff was and is therefore not liable to AHFCU in any amount under the loan agreement;

(d)     AHFCU shall restore to plaintiff the sum of $429.94 representing the amount which plaintiff paid AHFCU under the loan;

(e)     AHFCU shall forthwith do all things necessary to cause its tradeline to be deleted from plaintiff's credit report with the consumer reporting agencies.

518.    Resolution of the duties, responsibilities and obligations of the parties is necessary as no adequate remedy exists at law and a declaration of the Court is needed to resolve the dispute and controversy.

WHEREFORE, plaintiff respectfully prays that judgment be entered against defendants as follows:

(a)     awarding a declaratory judgment against AHFCU;

(b)     awarding actual damages, compensatory damages, punitive damages, incidental damages and consequential damages, and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 2310(d), NYUCC § 2-312 and NYUCC § 2-314 against the Dealership;

(c)     awarding actual damages, compensatory damages and punitive damages for common-law fraud in an amount to be determined at the time of trial against the Dealership;

(d)     enjoining the Dealership from committing further deceptive acts and practices towards plaintiff, pursuant to NYGBL § 349;

(e)     awarding actual damages against the Dealership pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(f)     in the alternative to (e), awarding statutory damages against the Dealership pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(g)     awarding treble damages against the Dealership pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(h)     awarding punitive damages against the Dealership pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(i)     awarding reasonable attorneys' fees, costs and disbursements against the Dealership pursuant to NYGBL § 349(h);

(j)     awarding actual damages, compensatory damages, incidental damages and punitive damages against the Dealership for conversion;

(k)     awarding actual damages, compensatory damages, and incidental damages against the Dealership for unjust enrichment;

(l)     awarding actual, compensatory, treble and punitive damages against AHFCU pursuant to 73 P.S. § 201-9.2;

(m)     awarding reasonable attorneys' fees, costs and disbursements against AHFCU pursuant to 73 P.S. § 201-9.2;

(n)     awarding pre-judgment interest; and

(o)     for such other and further relief as may be just and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury on all issues so triable.

Dated: New York, New York
July 4, 2023.

/s/  Novlette R. Kidd
NOVLETTE R. KIDD, ESQ. (NK 9339)
FAGENSON & PUGLISI, PLLC
Attorneys for Plaintiff
450 Seventh Avenue, Suite 704
New York, New York 10123
Tel.: (212) 268-2128
Nkidd@fagensonpuglisi.com